IN THE
UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

DARNELL COOPER,
    Plaintiff,

v.

WILLIAM BOND, *et al.*,
    Defendants.

Case No. 4:24-cv-04031-JEH

## Order

This matter is now before the Court on the parties' Motions for Summary Judgment under Federal Rule of Civil Procedure 56 and Local Rule 7.1(D)(1). (Docs. 109, 116, 118). For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED, and Defendants' Motions for Summary Judgment are GRANTED.

## I

On August 20, 2024, Plaintiff Darnell Cooper, proceeding *pro se*, filed an Amended Complaint under 42 U.S.C. § 1983 alleging that Defendants William Bond, Anthony Carter, Kurt Osmundson, and Wexford Health Sources, Inc. ("Wexford") were deliberately indifferent to his dry eye condition in violation of the Eighth Amendment while he was incarcerated at Hill Correctional Center ("Hill"). (Docs. 45, 53).

Plaintiff filed a Motion for Summary Judgment (Doc. 109); Defendants filed Responses (Docs. 119, 126); and Plaintiff filed Replies (Doc. 129, 137). Defendants Carter, Osmundson, and Wexford (the "Wexford Defendants") filed a Motion for Summary Judgment (Doc. 116); Plaintiff filed a Response (Doc. 127); and the Wexford Defendants filed a Reply (Doc. 139). Defendant Bond filed a Motion for

Summary Judgment (Doc. 118); Plaintiff filed a Response (Doc. 128); and Defendant Bond filed a Reply (Doc. 133).

## II

The Court finds the following material facts. During the relevant period between September 2022 and December 2023, Plaintiff was an inmate in the custody of the Illinois Department of Corrections ("IDOC") and incarcerated at Hill.

Defendant Dr. Kurt Osmundson was the Medical Director at Hill. (Doc. 116-1 at ¶ 3). Defendant Dr. Anthony Carter, a board-certified optometrist, provided optometry care to inmates at Hill. (Doc. 116-2 at ¶¶ 2-3). Defendants Osmundson and Carter were not responsible for receiving and handling inmates' sick call requests or grievances. (Doc. 116-1 at ¶ 5; Doc. 116-2 at ¶ 5). After entering medical orders, Defendants Osmundson and Carter relied on the nurses and prison staff to execute their orders, provide prescribed medication to inmates, maintain medication administration records, and schedule appointments. (Doc. 116-1 at ¶¶ 6-7; Doc. 116-2 at ¶¶ 6-7).

Defendant Dr. William Bond, a physician licensed to practice in the State of Illinois, performed private ophthalmological medical work at Bond Eye Associates, S.C. in Peoria and Pekin, Illinois. (Doc. 118 at pp. 140-141, ¶¶ 2, 8). Defendant Bond was not an employee, officer, agent, or apparent agent of Wexford or its subsidiaries, Hill, the IDOC, the State of Illinois, or any other government entity, nor did any such entity have the authority to direct or control his work as an ophthalmologist. *Id.* at ¶¶ 3, 5. Defendant Bond did not maintain a contractual relationship with Wexford to provide medical services to IDOC inmates. *Id.* at ¶¶ 4, 6. However, Bond Eye Associates had a contractual agreement with Wexford to provide optometry care to IDOC inmates. (Doc. 109 at pp. 68-70).

Prior to the relevant period, Plaintiff was diagnosed with dry eye syndrome and provided with lower punctual plugs in his left and right eyes. (Doc. 116-17 at p. 2). Punctual plugs are used to block the drainage of tears to help lubricate dry eyes. (Doc. 116-2 at ¶ 9).

On April 12, 2022, Defendant Carter saw Plaintiff for an eye examination and was unable to observe the lower left punctual plug. Concerned that the plug fell out, Defendant Carter ordered that Plaintiff be referred to an outside specialist. (Doc. 116-2 at ¶ 11; Doc. 116-9 at p. 33). On April 14, 2022, Defendant Osmundson approved the referral order. (Doc. 116-1 at ¶ 8). Defendants Carter, Osmundson, and Bond were not involved in the scheduling process. *Id.*; Doc. 116-2 at ¶ 12; Doc. 118 at p. 145, ¶ 19.

On September 7, 2022, Plaintiff was examined by Defendant Bond at Bond Eye Associates. *Id.* at p. 141, ¶ 9. Plaintiff presented with dry eye syndrome, allergies, and blepharitis in both eyes. *Id.* Plaintiff's vision was in the 20/30 to 20/40-2 range. *Id.* at pp. 152-158. Defendant Bond recommended a topical antihistamine and cool compresses/rinses and prescribed Maxitrol drops to treat Plaintiff's allergies and blepharitis. *Id.* Defendant Bond believed punctual plugs might be appropriate but wanted to see if Plaintiff's symptoms improved with the Maxitrol drops. *Id.* at pp. 141-142, ¶ 9c.

When Plaintiff returned to Hill, Defendant Osmundson attended a follow-up with Plaintiff and entered an order for the Maxitrol drops Defendant Bond prescribed. (Doc. 116-1 at ¶ 9; Doc. 116-4 at p. 6; Doc. 116-7 at p. 52). Defendant Bond had no authority or control over Plaintiff's access to or use of the medications he prescribed. (Doc. 118 at p. 144, ¶ 18a).

On September 13, 2022, Defendant Carter performed a review of Plaintiff's chart and noted Plaintiff saw Defendant Bond on September 7, 2022, and that Defendant Osmundson ordered the Maxitrol drops. (Doc. 116-2 at ¶ 13; Doc. 116-

4 at p. 6; Doc. 116-7 at p. 53). According to Defendants Carter and Osmundson, they were not made aware of any issue with Plaintiff receiving the Maxitrol drops between September 7, 2022 and October 4, 2022. (Docs. 116-1 at ¶ 10; Doc. 116-2 at ¶ 14).

On October 4, 2022, Plaintiff saw Defendant Bond for a follow-up appointment. (Doc. 118 at p. 142, ¶ 10). Plaintiff reported he never received the Maxitrol drops and artificial tears. *Id.* at p. 160. Plaintiff also reported an increase in eye blurriness and dryness, as well as some pain and discomfort in the mornings due to dryness. *Id.* Based on his evaluation and Plaintiff's worsening symptoms, Defendant Bond suggested punctual occlusion to relieve Plaintiff's dry eye symptoms. *Id.* at p. 142, ¶ 10a; pp. 159-163. Based on Defendant Bond's education, experience, and training as an ophthalmologist, he believed the presence of allergies would not hinder the effectiveness of the plugs or cause adverse effects, such as pain or worsening vision. *Id.* at p. 142, ¶ 10d. Defendant Bond placed a bilateral upper permanent punctual plug in each eye. *Id.* at ¶ 10c. Plaintiff claims he did not provide consent to have the punctual plugs placed in his eyes while the infection was still present. (Doc. 128 at p. 30, ¶ 49). Defendant Bond instructed Plaintiff to use Maxitrol and artificial tears. (Doc. 118 at p. 142, ¶ 10c; p. 163).

According to Defendant Carter, he was not informed of, nor consulted with regarding, Defendant Bond's treatment decisions, including placement of the upper punctual plugs. (Doc. 116-2 at ¶ 15). Upon Plaintiff's return to Hill, Defendant Carter and another practitioner approved and entered the order for Maxitrol. (Doc. 116-4 at p. 6; Doc. 116-7 at pp. 55-56). Plaintiff received the Maxitrol drops as prescribed. (Doc. 116-16 at pp. 24-25).

On October 18, 2022, Defendant Carter performed a review of Plaintiff's chart and noted Plaintiff was using Maxitrol and scheduled for further follow-up with Defendant Bond. (Doc. 116-2 at ¶ 16; Doc. 116-7 at p. 57). On October 20, 2022,

Defendant Osmundson reviewed and approved an order for a follow-up examination with Defendant Bond. (Doc. 116-1 at ¶ 11; Doc. 116-7 at p. 58).

During an appointment with Defendant Bond on October 31, 2022, Plaintiff complained of bilateral eye pain and swelling in his left eye. Plaintiff stated he stopped using Maxitrol because it caused more irritation. Upon examination, Defendant Bond noted Plaintiff had improvement in the tear film, which indicated improvement of Plaintiff's dry eye syndrome. Defendant Bond concluded Plaintiff might be allergic to Maxitrol and prescribed Tobradex. (Doc. 118 at pp. 142-143, ¶ 11; pp. 164-167).

During the next follow-up appointment with Defendant Bond on December 7, 2022, Plaintiff complained of watery eyes and denied any eye pain. Upon examination, Defendant Bond noted Plaintiff's dry eye syndrome showed signs of continued improvement, which indicated the upper punctual plugs were effective. Defendant Bond discontinued Tobradex and recommended artificial tears, cool compresses, and Prednisolone for allergy relief. *Id.* at p. 143, ¶ 12; pp. 168-172.

On December 13, 2022, Defendant Carter saw Plaintiff for a follow-up appointment, renewed Plaintiff's medications, ordered a follow-up examination with Defendant Bond, and instructed Plaintiff how to use the eye drops as directed. (Doc. 116-2 at ¶ 17; Doc. 116-7 at p. 66).

In February 2023, Plaintiff submitted a sick call request regarding his eye condition. Plaintiff was scheduled to see Defendant Carter on February 14, 2023, but Plaintiff did not attend the appointment. As a result, the appointment was rescheduled. (Doc. 116-8 at p. 55).

On February 28, 2023, Defendant Carter examined Plaintiff, noted the lower left punctual plug was still not visible, and referred Plaintiff to Defendant Bond for a follow-up. (Doc. 116-2 at ¶ 18; Doc. 116-8 at p. 58; Doc. 116-9 at p. 3). On

March 3, 2023, Defendant Osmundson approved the referral order. (Doc. 116-1 at ¶ 12; Doc. 116-8 at p. 58; Doc. 116-9 at p. 5).

During a follow-up appointment with Defendant Bond on March 21, 2023, Plaintiff complained of tearing, blurry vision, and eye pain. According to Defendant Bond, the punctual plugs seemed to be effective, and Plaintiff's dry eye syndrome showed signs of improvement. Defendant Bond instructed Plaintiff to use artificial tears, cool compresses, and Prednisolone for allergy relief. (Doc. 118 at p. 143, ¶ 13; pp. 174-178).

Defendants Carter and Osmundson were not made aware of any requests for eye care between March 22, 2023 and June 5, 2023. (Doc. 116-1 at ¶ 13; Doc. 116-2 at ¶ 19). During an optometric exam with Defendant Carter on June 6, 2023, Plaintiff complained his eyes were watering excessively, and Defendant Carter referred him to Defendant Bond. (Doc. 116-2 at ¶ 20; Doc. 116-4 at p. 10).

Plaintiff was scheduled for an appointment with Defendant Bond on July 17, 2023, but the visit was canceled by Bond Eye Associates due to an alleged lack of payment from Defendant Wexford. (Doc. 116-4 at p. 11). After the issue was remedied, Plaintiff saw Defendant Bond one week later on July 24, 2023.

During the appointment with Defendant Bond on July 24, 2023, Plaintiff complained of pain, blurry vision, and tearing and stated the upper punctual plugs were bothersome. Defendant Bond noted Plaintiff's vision was in the 20/20 to 20/25 range, and there were no signs of dry eye or allergies. Plaintiff asked Defendant Bond to remove the upper punctual plugs. Defendant Bond explained the plugs could not be removed but only flushed down. Upon receiving consent from Plaintiff, Defendant Bond flushed the upper punctual plugs down. (Doc. 118 at pp. 143-144, ¶ 14a-c; pp. 179-182).

On October 17, 2023, Plaintiff saw Defendant Carter for an optometric exam and complained of dry, painful eyes with tearing. Defendant Carter ordered that

6

Plaintiff "[r]estart zaditor bid OU, continue fish oil 2000mg qd, Artifical Tear Systane ointment tid OU, warm compress tid OU, consider chronic steroids, punctual plug lower lid OS, tepezza treatment." (Doc. 116-2 at ¶ 21; Doc. 116-9 at p. 35).

On October 31, 2023, Defendant Carter ordered that Plaintiff be referred to Illinois Eye Center for possible replacement of the lower left punctual plug and to assess whether Plaintiff was a proper candidate for the Tepezza treatment. (Doc. 116-2 at ¶ 22; Doc. 116-4 at p. 13).

On December 14, 2023, Plaintiff saw Dr. Christian Briggs at Illinois Eye Center. Dr. Briggs determined Plaintiff's left lower punctual plug was still present and had migrated lower into the puncta. (Doc. 116-15 at pp. 13-17). According to Defendant Carter, the left lower punctual plug was still serving its intended purpose to treat Plaintiff's complaints of dry eye, was in a safe position, and posed no threat to Plaintiff's eye or vision. (Doc. 116-2 at ¶ 24).

On December 19, 2023, Defendant Carter saw Plaintiff for a follow-up visit, educated Plaintiff regarding punctual plugs and his dry eye condition, and ordered Maxitrol for three weeks. (Doc. 116-2 at ¶ 25; Doc. 116-4 at p. 14).

According to the Wexford Defendants' expert, Dr. Stephen Russell, a board-certified ophthalmologist, dry eye syndrome is difficult to treat and may not respond well to certain treatments. (Doc. 116-17 at p. 2). Dr. Russell opined "[t]he overall management of Mr. Cooper's eye condition and complaints [was] well within the standard of care for dry eye syndrome, and no reduction in vision or corneal structural changes resulted during this time." *Id.* at p. 3. Dr. Russell also opined that Plaintiff "receive[d] prompt care responsive to his symptoms." *Id.*

According to Defendant Bond's expert, Dr. Andrea Birnbaum, a board-certified ophthalmologist, Defendant Bond's assessment and treatment of Plaintiff aligned with the applicable standard of care. (Doc. 118 at p. 150, ¶ 13). Dr.

Birnbaum opined "[t]he placement of bilateral permanent upper punctual plugs is a reasonable treatment that is not associated with significant pain, even if placed when the patient presents with allergies, and was likely to offer symptomatic relief to Mr. Cooper." *Id.* at p. 149, ¶8a. Dr. Birnbaum also stated: "There is no evidence that Mr. Cooper requested that Dr. Bond remove or flush down the bilateral permanent punctual plugs prior to July 24, 2023. . . . It was not medically necessary to flush down the plugs at any point, including July 24, 2023, as Mr. Cooper's dry eye appeared to be improving based on clinical evaluations." *Id.* at p. 150, ¶ 14.

### III

### A

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

8

**B**

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). Deliberate indifference involves a two-part analysis; the plaintiff must show that (1) the medical condition was objectively serious, and (2) the prison official acted with deliberate indifference to his medical needs. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021).

An objectively serious injury or medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765-66 (7th Cir. 2002) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997)). An objectively serious medical need may also be found "if failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain." *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (quoting *Guiterez*, 111 F.3d at 1373).

To establish the subjective element of a deliberate indifference claim, the plaintiff must show that the prison official acted with a sufficiently culpable state of mind. *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). "[A] plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "This is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). "[M]ere negligence" or even civil "objective recklessness" simply "is not enough." *Petties*, 836 F.3d at 728. "This subjective standard requires more than negligence

and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citing *Farmer*, 511 U.S. at 837) (internal citations omitted).

"Within the universe of deliberate indifference cases is a narrower category where a prisoner alleges not that his condition was ignored entirely, but that he received constitutionally deficient treatment for the condition." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). "[T]hese cases are better framed 'not [as] deliberate indifference to a serious medical need,' but as a challenge to 'a deliberate decision by a doctor to treat a medical need in a particular manner.'" *Id.* (citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)). In such cases, courts defer to a medical professional's treatment decisions "unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). A disagreement between the prisoner and his medical provider "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409 (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)).

## IV

Defendant Bond argues he is entitled to summary judgment because he was not acting under color of state law when he provided medical treatment to Plaintiff.

To state a claim under § 1983, a plaintiff must show that he was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."

*West v. Atkins*, 487 U.S. 42, 50 (1988). Medical providers can fall under the purview of § 1983 as well. *Id.* at 52. However, to show a private medical provider is a state actor pursuant to § 1983, "the dispositive issue concerns the relationship among the State, the physician, and the prisoner." *Id.* at 56; *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014) (citing *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 826 (7th Cir. 2009)). Because the State bears an affirmative obligation to provide medical care to prisoners, when the State delegates that function to a medical provider and that provider "voluntarily assume[s] that obligation by contract," that physician becomes a person acting under color of law. *West*, 487 U.S. at 56. However, a medical provider does not become a state actor merely by treating an inmate. *See Shields*, 746 F.3d at 798 (finding undisputed facts did not allow reasonable inference that outside doctors acted under color of state law when they took the referral from Wexford).

Here, Defendant Bond submitted an affidavit stating that he was not employed by Wexford, Hill, the IDOC, the State of Illinois, or any other government entity and did not have a contract to provide medical services to inmates. (Doc. 118 at p. 140, ¶¶ 3-6). Defendant Bond performed private ophthalmological medical work at Bond Eye Associates. *Id.* at ¶ 8. Defendant Bond argues that when Plaintiff was referred to Bond Eye Associates, he provided medical services to Plaintiff in the same place and manner as his other patients.

In Plaintiff's Response, Plaintiff cites a contract between Bond Eye Associates and Wexford and evidence of payment by Wexford to Bond Eye Associates. (Doc. 109 at pp. 68-70, 111-112). The agreement states:

> Wexford Health Sources has entered into an agreement with the Illinois Department of Corrections (IDOC) and is responsible for healthcare services to their inmates while incarcerated ("covered period"). This Letter of Agreement (LOA) is designed to outline the agreement made by and between Wexford Health Sources, Inc

("Wexford") and Bond Eye Associates ("Provider"), for payment for services rendered by the Provider during any inmates' covered period[.]

Execution of this LOA binds the parties to the following terms and conditions:

1    Provider agrees to provide medically necessary and authorized medical services for Ophthalmology and Optometry on a PRN basis

…

*Id.* at p. 68.

In his Reply, Defendant Bond does not dispute this agreement was in place. Instead, he argues Plaintiff did not provide any evidence that he *directly* contracted with Wexford or was paid by Wexford.

"A business like Wexford that contracts to provide medical care to prisoners undertakes freely, and for consideration, responsibility for a specific portion of the state's overall [constitutional] obligation to provide medical care for incarcerated persons, and thus acts under color of state law for purposes of § 1983." *Shields*, 746 F.3d at 797 (internal citation and quotations omitted). However, "medical providers who have 'only an incidental or transitory relationship' with the penal system generally are not considered state actors." *Id.* at 797-98 (quoting *Rodriguez*, 577 F.3d at 827).

In *Shields*, the Seventh Circuit found that two outside physicians, Dr. Olysav and Dr. Froelich, had "only an incidental and transitory relationship with the penal system," as Wexford referred the plaintiff to Dr. Olysav for a one-time examination, which he performed with Dr. Froelich's assistance. *Shields*, 746 F.3d at 798. The physicians never scheduled follow-up appointments with the plaintiff or retained responsibility for his course of treatment. *Id.* The Seventh Circuit also noted "[t]heir relationship with Wexford was similarly too attenuated to support

the conclusion that they were acting under color of state law." *Id.* There was no evidence they had a contract with Wexford or the prison or that they regularly treated inmates as part of their practices. *Id.*

Here, however, the evidence shows Defendant Bond had more than an "incidental or transitory relationship" and treated Plaintiff on six occasions on September 7, 2022, October 4, 2022, October 31, 2022, December 7, 2022, March 21, 2023, and July 24, 2023. The facts in this case are distinguishable from *Shields* where the plaintiff was referred by Wexford to an outside physician who "had nothing more to do with the patient" after a "one-time examination." *Id.* Unlike in *Shields* where there was no evidence of a contract with Wexford, Plaintiff produced a written agreement between Wexford and Bond Eye Associates to provide treatment for IDOC inmates. Defendant Bond asserts he did not maintain a contractual relationship with Wexford to provide medical services, but Defendant Bond performed ophthalmological medical work at Bond Eye Associates, which received payment from Wexford for the treatment he provided to Plaintiff. (Doc. 109 at pp. 111-112; Doc. 118 at p. 141, ¶ 8). Although Defendant Bond argues Wexford had no authority to direct or control his work as an ophthalmologist, "[d]efendants are not removed from the purview of § 1983 simply because they are professionals acting in accordance with professional discretions and judgment." *West*, 487 U.S. at 52. The Court finds Defendant Bond was acting under color of state law when he treated Plaintiff.

## A

To succeed on his deliberate indifference claim, Plaintiff must first show his dry eye syndrome was an objectively serious medical need. Defendant Bond argues Plaintiff cannot demonstrate he suffered from a serious medical condition or that the presence of upper punctual plugs caused Plaintiff's alleged pain and

13

suffering. (Doc. 118 at p. 20). The Wexford Defendants did not address this issue in their briefs.

The need for an eye examination alone is generally insufficient to establish a serious medical need. *Franklin v. McCaughtry*, 110 F. App'x 715, 721 (7th Cir. 2004). "[A] plaintiff's complaints about eye issues interfering with daily life in a marginal fashion does not amount to a serious medical need." *Alexander v. Richter*, No. 15-CV-766-WMC, 2017 WL 5634132, at *3 (W.D. Wis. Nov. 22, 2017), *aff'd*, 756 F. App'x 611 (7th Cir. 2018) (citing cases). Plaintiff's dry eye condition, which was diagnosed by a physician on September 4, 2018, was more serious than simply a need for a routine eye examination or glasses. (Doc. 116-17 at p. 2). Plaintiff's medical records show that he was referred to outside specialists, received upper and lower punctual plugs, and was prescribed medications. Plaintiff also complained about blurry vision, dry eyes, and pain during the relevant period. Based on the facts in this case, the Court finds Plaintiff's dry eye condition was objectively serious. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 459 (7th Cir. 2020) (finding plaintiff's eye condition was more complex than the average patient's and could constitute an objectively serious medical need) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) ("A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.").

### B

### 1

Plaintiff argues Defendant Bond was deliberately indifferent to his dry eye condition by providing inadequate treatment. Specifically, Plaintiff claims Defendant Bond placed upper punctual plugs in his eyes on October 4, 2022, while he was still suffering from an infection. (Doc. 109 at p. 9). Plaintiff claims he experienced blurry vision, tearing, and pain due to the placement of the upper

punctual plugs. Plaintiff claims he asked Defendant Bond to remove the punctual plugs on July 24, 2023, but Defendant Bond did not remove them until October 2023. *Id.* at p. 10.

Defendant Bond argues he is entitled to summary judgment because Plaintiff cannot establish his care or the placement of upper punctual plugs caused or worsened Plaintiff's dry eye condition. Additionally, Defendant Bond argues the evidence shows he flushed down Plaintiff's punctual plugs on July 24, 2023.

During Plaintiff's first examination with Defendant Bond on September 7, 2022, Defendant Bond concluded Plaintiff was suffering from dry eye syndrome, allergies, and blepharitis in both eyes and prescribed Maxitrol drops. Plaintiff alleges he never received the Maxitrol drops, but as an outside specialist, Defendant Bond was not responsible for ensuring that Plaintiff received his medication at the prison. (Doc. 118 at p. 144, ¶ 18a).

During the second appointment on October 4, 2022, Plaintiff reported he had not received Maxitrol and was experiencing increased eye blurriness, dryness, pain, and discomfort. Based on Plaintiff's worsening symptoms, Defendant Bond suggested permanent punctual occlusion. Plaintiff claims he was suffering from an infection, but the record indicates he had allergies rather than an infection. *Id.* at p. 88:5-11. Plaintiff did not present any evidence to corroborate that he had an infection or that the placement of the punctual plugs was prohibited. Defendant Bond believed to a reasonable degree of medical certainty that the presence of allergies would not hinder the punctual plugs' effectiveness or cause adverse effects. *Id.* at p. 142, ¶ 10. According to Defendant Bond's expert, Dr. Birnbaum, the placement of bilateral permanent upper punctual plugs "is not associated with significant pain, even if placed when the patient presents with allergies, and was likely to offer symptomatic relief to Mr. Cooper." *Id.* at pp. 148-149, ¶ 8a-b.

15

Plaintiff alleges Defendant Bond refused to remove the upper punctual plugs until October 2023, despite his complaints of severe pain, blurred vision, eye swelling, and discoloration. There is no evidence that Plaintiff saw Defendant Bond in October 2023, as Plaintiff's last appointment with Defendant Bond was on July 24, 2023. *Id.* at p. 144, ¶ 17. During this appointment, Plaintiff complained of pain, blurry vision, tearing, and irritation, which Plaintiff attributed to the upper punctual plugs. Upon evaluation, Defendant Bond found Plaintiff's vision was in the 20/20 to 20/25 range and found no evidence of dry eye syndrome or allergies. Based on his education, training, and experience as an ophthalmologist, Defendant Bond concluded Plaintiff's punctual plugs remained effective, and there were no objective signs to indicate the plugs needed to be removed. In response to Plaintiff's requests, Defendant Bond flushed down the upper punctual plugs on July 24, 2023. *Id.* at p. 182. Plaintiff admitted in a medical request form dated September 13, 2023, that Defendant Bond had already removed the punctual plugs. *Id.* at p. 193. There is no evidence that Defendant Bond waited until October 2023 to remove the plugs.

Although Plaintiff is dissatisfied with the care he received, his dissatisfaction does not amount to an Eighth Amendment violation. Plaintiff's disagreement about the proper course of treatment is insufficient to establish an Eighth Amendment claim. *Johnson*, 433 F.3d at 1013. A "medical professional is entitled to deference in their treatment decisions, unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 857-858 (7th Cir. 2011). There is no evidence that Defendant Bond's treatment decisions for Plaintiff's dry eye condition were "such a substantial departure from accepted professional judgment, practice, or standards." *Sain*, 512 F.3d at 895 (internal citations omitted). Even if Defendant Bond should have waited until Plaintiff used the Maxitrol drops before he placed the punctual plugs,

16

Defendant Bond's actions do not extend beyond mere negligence into the realm of deliberate indifference. *See Gayton*, 593 F.3d at 623 (citation omitted). Based on the undisputed facts, no reasonable jury would find that Defendant Bond was deliberately indifferent to Plaintiff's dry eye condition. Defendant Bond is entitled to summary judgment.

**2**

Plaintiff argues Defendant Osmundson did not properly refer him for outside care and delayed his care for several months. The Wexford Defendants argue Defendant Osmundson is entitled to summary judgment because there is no evidence to show that he refused to refer Plaintiff for outside treatment or was responsible for any delay.

Plaintiff's medical records show Defendant Osmundson consistently and promptly approved referrals with outside specialists. For instance, when Defendant Carter entered an order to refer Plaintiff to a specialist on April 12, 2022, Defendant Osmundson approved the referral order two days later on April 14, 2022. After approval of the order, Defendant Osmundson was not involved with the process of scheduling Plaintiff's visit with Defendant Bond. (Doc. 116-1 at ¶ 8). On October 18, 2022, Defendant Carter referred Plaintiff for a follow-up examination with Defendant Bond, and Defendant Osmundson approved the referral order two days later on October 20, 2022. On February 28, 2023, Defendant Carter referred Plaintiff for another follow-up appointment with Defendant Bond, and Defendant Osmundson approved the referral order three days later on March 3, 2023. Plaintiff claims his appointments with Defendant Bond were delayed due to scheduling and payment issues, but Plaintiff fails to provide any evidence indicating that Defendant Osmundson was aware of any issues or responsible for delays.

17

Plaintiff also asserts Defendant Osmundson was deliberately indifferent by referring him to Defendant Bond instead of Illinois Eye Center. Plaintiff argues that Illinois Eye Center was the "best" facility to treat his condition. Although Defendant Osmundson admits that Illinois Eye Center was "a proper and appropriate facility for treating Plaintiff," there is no evidence that Illinois Eye Center was the only appropriate outside facility for treating Plaintiff's dry eye condition. According to Dr. Russell, the overall management of Plaintiff's eye condition and complaints were well within the standard of care for dry eye syndrome. (Doc. 116-17 at p. 3). Under the Eighth Amendment, Plaintiff is "not entitled to the best care possible." *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Based on the undisputed facts, no reasonable jury could find that Defendant Osmundson was deliberately indifferent to Plaintiff's serious medical needs. Defendant Osmundson is entitled to summary judgment.

**3**

Plaintiff argues Defendant Carter was deliberately indifferent by recklessly disregarding Defendant Bond's prescription for Maxitrol and by "turning a blind eye" to Defendant Bond's allegedly inappropriate treatment.

On September 7, 2022, Defendant Bond ordered Plaintiff to use Maxitrol drops to clear an allergy in his eyes. When Plaintiff returned to Hill after his visit with Defendant Bond, Defendant Osmundson entered the order for Maxitrol. On September 13, 2022, Defendant Carter performed a review of Plaintiff's chart and noted Plaintiff saw Defendant Bond on September 7, 2022, that a prescription for Maxitrol was issued, and that Defendant Osmundson ordered the prescription the same day. (Doc. 116-2 at ¶ 13). Defendant Carter relied on the nurses and prison

18

staff to provide prescribed medications as ordered and did not know Plaintiff had not received his Maxitrol drops. *Id.* at ¶¶ 7, 14. Although Plaintiff claims he told Defendant Carter on September 13, 2022, that he never received the Maxitrol drops, Plaintiff did not provide any evidence to substantiate this assertion. (Doc. 127 at p. 4, ¶ 18).

During Plaintiff's second appointment with Defendant Bond on October 4, 2022, Defendant Bond prescribed Maxitrol drops again. The same day, Defendant Carter and another practitioner approved and entered the order for Maxitrol. Plaintiff admits he received the drops as prescribed in October 2022. (Doc. 116-16 at pp. 24-25). No reasonable jury could find that Defendant Carter was deliberately indifferent by disregarding the prescription for Maxitrol.

Plaintiff claims Defendant Carter "turned a blind eye" to Defendant Bond's allegedly inappropriate treatment, but Plaintiff fails to produce any evidence that the treatment Defendant Bond provided was improper. Instead, the evidence and expert opinions show that the care Defendant Bond provided fell within the applicable standard of care. (Doc. 116-17; Doc. 118 at pp. 147-151). Defendant Carter was not deliberately indifferent to Plaintiff's dry eye condition by continuing to refer him to Defendant Bond. *See Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference.").

Even if the treatment Defendant Bond provided was inappropriate, a reasonable jury could not find that Defendant Carter personally realized there was a risk that Plaintiff's dry eye condition was not being treated properly. *See Shields*, 746 F.3d at 797 (finding that no reasonable jury could find that Wexford physicians "personally realized there was a risk that [plaintiff's] injury was not being treated properly, and so could not find that either consciously disregarded that risk"). As

19

Dr. Russell opined, "dry eye syndrome can be difficult to treat, and may respond poorly to a particular approach or medication." (Doc. 116-17 at p. 2).

The evidence shows Defendant Carter provided prompt and appropriate care to address Plaintiff's dry eye syndrome. While Plaintiff may be dissatisfied with his care, Plaintiff is not a medical professional and his disagreement with the course of his treatment does not support a claim for deliberate indifference. *See Snipes*, 95 F.3d at 590-91. Based on the undisputed facts, no reasonable jury could find that Defendant Carter was deliberately indifferent to Plaintiff's dry eye condition. Defendant Carter is entitled to summary judgment.

**4**

Plaintiff alleges Defendant Wexford had an express policy regarding payments for outside medical providers, which caused a delay in his treatment. (Doc. 45 at p. 34). Plaintiff argues Defendant Wexford's policy to consider costs influenced his referrals for outside care. Plaintiff claims he was referred to Defendant Bond because Illinois Eye Center was more expensive. Defendant Wexford argues it is entitled to summary judgment because there is no proof of any constitutional violation, and Plaintiff failed to provide any evidence that consideration of costs played a role in his referrals for outside care.

As a private corporation, Wexford is held to a *Monell* theory of liability for § 1983 claims. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (citing *Shields*, 746 F.3d at 790) (noting every circuit court that has addressed the issue has extended the *Monell* standard to private corporations acting under color of state law)). As a result, Plaintiff must "show that Wexford's policy, practice, or custom, caused a constitutional violation." *Whiting*, 839 F.3d at 664 (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009)). "Liability may be based on (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized

20

by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policy making authority." *Taylor v. Wexford Health Sources, Inc.*, No.15-5190, 2016 WL 3227310, at \*4 (N.D. Ill. June 13, 2016) (citing *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000)). "[T]he policy or practice must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted) (internal quotation marks omitted).

Plaintiff was originally scheduled for a follow-up examination with Defendant Bond on July 17, 2023, but Bond Eye Associates canceled the appointment due to an alleged lack of payment from Defendant Wexford. The issue was quickly remedied, however, and Plaintiff saw Defendant Bond on July 24, 2023. There is no evidence that a one-week delay violated Plaintiff's constitutional rights.

As the Court stated above, no reasonable jury would find that Defendants Osmundson and Carter were deliberately indifferent by referring Plaintiff to Defendant Bond. Although Plaintiff claims that "Illinois Eye Center charges twice as much as defendant Bond," Plaintiff fails to provide any foundation for the amounts charged. (Doc. 109 at p. 29). There is no evidence that a policy to consider costs played a role in referring Plaintiff to Defendant Bond. (Doc. 116-1 at ¶ 14).

Because Plaintiff did not establish that he suffered any constitutional deprivation, Wexford is entitled to summary judgment as a matter of law.

## V

For the reasons stated, *supra*:

(1)    Plaintiff's Motion for Summary Judgment [109] is DENIED. Defendants Anthony Carter, Kurt Osmundson, and Wexford Health Sources, Inc.'s Motion for Summary Judgment [116] is GRANTED. Defendant William

Bond's Motion for Summary Judgment [118] is GRANTED. Defendants Carter, Osmundson, Wexford, and Bond are DISMISSED WITH PREJUDICE. Plaintiff takes nothing. Each side is to bear their own attorney's fees, costs, and expenses.

(2)     Plaintiff's Motion for Status [146] is MOOT.

(3)     The Clerk is directed to close this case and enter judgment.

(4)     Although this case has been dismissed, Plaintiff remains responsible for any remainder of the $350 filing fee. (d/e 2/9/2024).

(5)     If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).

(6)     To proceed *in forma pauperis* on appeal, Plaintiff must file a motion to proceed on appeal *in forma pauperis* and identify the issues he will present on appeal to assist the Court in determining whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(1)(c); *Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (An appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal.

*It is so ordered.*

Entered: January 30, 2026

<u>s/Jonathan E. Hawley</u>
U.S. District Judge

22